2010 BNH 010      Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                                      Bk. No. 09-13097-JMD
                                                                                             Chapter 11
Bruce G. Jennings,
          Debtor

Guy B. Moss, Esq.                                      Brian F. McCaffrey, Esq.
Alan L. Braunstein, Esq.                               McCaffrey, P.A.
Riemer & Braunstein LLP                                Exeter, New Hampshire
Boston, Massachusetts                                  Attorney for Debtor
Attorneys for Debtor

Alexander S. Buchanan, Esq.                            Andrew H. Sullivan, Esq.
Buchanan, Maynard & Parodi, PLLC                       Bedford, New Hampshire
Nashua, New Hampshire                                  Attorney for MRT Investment & Development, LLC
Attorney for Bluestone Capital, LLC

## MEMORANDUM OPINION

### I. INTRODUCTION

Bruce Jennings (the "Debtor") filed a motion seeking approval of certain liens in favor of professionals that he retained in this case, in lieu of a cash retainer (Doc. No. 24) (the "Motion"). The Motion seeks a priming lien on several properties owned by the Debtor:

> (1) two parcels of land in Sunapee, New Hampshire (the "First Sunapee Parcels") which are subject to a first mortgage lien held by MRT Investment & Development, LLC ("MRT");
>
> (2) two parcels of land in Sunapee, New Hampshire (the "Second Sunapee Parcels") subject to a first mortgage lien held by Bluestone Capital, LLC ("Bluestone")[1];

---

[1] MRT and Bluestone are collectively the "Creditors" and the First Sunapee Parcels and the Second Sunapee Parcels are collectively the "Sunapee Land."

(3) a parcel of land with a partially renovated structure in Orange, New Hampshire (the "Blueberry Farm") subject to a first mortgage held by Bluestone securing the same obligation as the Second Sunapee Parcel;

and as additional collateral,

(4) a junior lien on all other encumbered real property owned by the Debtor; and

(5) a first priority lien on all unencumbered real property owned by the Debtor.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

After giving notice, the Court held non-evidentiary hearings on the Motion on September 8, September 29, and October 15, 2009.  On November 9, 2009, the Court issued a scheduling order (Doc. No. 75) (the "Scheduling Order") which required the Debtor to submit all evidence in support of the Motion by way of affidavits or declarations on or before December 4, 2009. Bluestone and MRT where ordered to submit their evidence in opposition to the Motion, by way of affidavits or declarations, on or before December 31, 2009.  All parties had until January 8, 2010, to request a further evidentiary or non-evidentiary hearing, failing which the Court would decide the Motion on the pleadings and the proffers of evidence under the Scheduling Order.  No party requested a hearing.  The Debtor filed a motion on January 28, 2010, to strike the appraisal evidence proffered by Bluestone (Doc. No. 97) (the "Motion to Strike") and Bluestone filed a response (Doc. No. 105).

**A. The Motion to Strike**

The Motion to Strike is based upon a statement in the appraisal report of Jonathan Frank, submitted by Bluestone, about alleged comments by Mr. Francesco Rotondo of USA Springs regarding the length of time necessary to obtain permits to extract and sell bulk water. The Debtor contends that Mr. Frank never spoke with Mr. Rotondo and that Mr. Rotondo never made the statements attributed to him, and if he did, they were in an entirely different context. The reference to Mr. Rotondo's views on water permitting in New Hampshire are contained on page 42 of the Bluestone appraisal report. Mr. Rotondo's alleged statement is one of two reasons why Mr. Frank determined that he would place no value on the Sunapee Land's potential water rights. The Debtor contends that Mr. Frank is not qualified to appraise the value of water rights. Even assuming that the Debtor's arguments in the Motion to Strike are true and correct, they only pertain to the reasons Mr. Frank did not include any value for the water rights in his appraisal report, not that he gave an unqualified opinion of value. The Court notes that the Debtor's proffered evidence does not include any valuation for the water rights in the Sunapee Land. See Declaration of Darryl Salls ¶ 8 (Doc. No. 87); Declaration of Bruce G. Jennings ¶ 10 (Doc. No. 88). Since none of the proffered evidence on the value of the Sunapee Land includes any opinion on the value of bulk water extraction rights, the Motion to Strike is a *non sequitur*. Accordingly, the Motion to Strike shall be denied.

**B. The Evidentiary Record**

After reviewing the evidentiary record submitted by the parties pursuant to the Scheduling Order, the Court finds that the Debtor owns a number of contiguous parcels of unimproved land in Sunapee, New Hampshire, aggregating approximately 320 acres (the

3

"Sunapee Land"), which includes the First and Second Sunapee Parcels.[2] The Debtor also appears to own other improved parcels of land in Sunapee, New Hampshire, including 68 West Court Road (the "Residence" or "Hilltop") and 16 Cooper Street, Georges Mills (Sunapee), New Hampshire (the "Butternut Cottage"), as well as a house in Epohoqui, New Brunswick, Canada (the "Stone House"). The Residence and the Stone House are not included in the Debtor's request for a lien for the benefit of his bankruptcy professionals.

In brief, the Motion is a request for authorization to incur a secured debt with priority over existing consensual mortgage claims and for authorization to incur secured debt in connection with retaining professionals who would otherwise hold a priority unsecured claim for any fees and expenses approved by the Court. The evidentiary record submitted by the parties pursuant to the Scheduling Order establishes, for the purposes of the Motion, the following:

| | |
|---|---|
| MRT secured claim | $ 498,154.00 |
| Bluestone secured claim | $ 281,269.00 |
| Butternut Cottage mortgage | $ 119,390.00[3] |
| Priority real estate tax claims | $     3,274.00 |
| Requested priming lien | $ 100,000.00 |
| Total | $1,002,087.00[4] |

The Debtor contends that the value of the property which is to be subject to the proposed lien for bankruptcy professionals is:

---

[2] The record in this proceeding fails to establish whether the First Sunapee Parcel and the Second Sunapee Parcel, together, are all of the Sunapee Land, or whether other parcels not subject to the liens of MRT and Bluestone are included in the Sunapee Land. Accordingly, the Court shall assume for the purposes of this order that there are no such other parcels included in the Sunapee Land that add any material value. If the Sunapee Land includes additional unencumbered parcels, the decision on the Motion remains unchanged for the reasons discussed in section III.B.2 below.

[3] Amount of secured claim taken from the Debtor's schedules.

[4] For the reasons discussed in this order, the Court has used the maximum amount of the alleged secured claims.

|                   |                |
|-------------------|----------------|
| Sunapee Land      | $6,500,000.00  |
| Blueberry Farm    | $   109,000.00 |
| Butternut Cottage | $   300,000.00 |
| Total             | $6,909,000.00  |

Bluestone and MRT contend that the value for the property which is to be subject to the proposed lien for bankruptcy professionals is:

|                   |                 |
|-------------------|-----------------|
| Sunapee Land      | $1,050,000.00   |
| Blueberry Farm    | $    70,000.00  |
| Butternut Cottage | $   300,000.00[5] |
| Total             | $1,420,000.00   |

Therefore, the Debtor contends that he has $5,906,913.00 in equity to cover liens totaling $1,002,087.00. However, the value of the property over which the Debtor proposes a priming lien senior to the liens of MRT and Bluestone does not include the Butternut Cottage. Therefore, excluding the value of the Butternut Cottage and the liens on that parcel, the Debtor proposes to prime $882,697.00 of liens on the First Sunapee Parcel, the Second Sunapee Parcel and the Blueberry Farm Parcel, which he values at $6,609,000.00. The Creditors contend that the value of the collateral securing the liens which the Debtor seeks to prime is $1,420,000.00.

## III. DISCUSSION

### A. Grant of Mortgage As Security For Fees

The Bankruptcy Code requires that attorneys and other professional persons employed by a chapter 11 debtor-in-possession not hold or represent an interest adverse to the bankruptcy estate and be "disinterested persons." 11 U.S.C. § 327(a). However, a person who is a creditor of the bankruptcy estate is not a disinterested person. 11 U.S.C. § 101(14). A creditor is defined

---

[5] Neither MRT nor Bluestone proffered any value for the Butternut Cottage. Therefore, the Court shall use the value proffered by the Debtor.

5

as a person holding a claim against the bankruptcy estate. 11 U.S.C. §§ 101(10) and 101(15). Since, a creditor, by definition, holds an interest that is adverse to the estate, the issue here is whether an attorney or other professional employed by a debtor-in-possession may hold a mortgage to secure the payment of fees that may be allowed by a bankruptcy court without disqualification for employment. The First Circuit has answered this question in the affirmative. See In re Martin, 817 F.2d 175 (1st Cir. 1987).

The grant of security for the payment of fees is not *per se* impermissible. Id. at 183. The nature and extent of any conflict, as well as the likelihood that a potential conflict may become an actual conflict must be determined by the bankruptcy court. Id. at 182. The court must determine that granting the security does not create any actual conflict of interest between the professional and the bankruptcy estate and that it does not create a reasonable perception of a potential conflict. Id. The court's "inquiry is of necessity case-specific." Id. All doubts about the appearance of or the potential for a conflict of interest must be resolved against the grant of security for fees. Id. at 183.

In this case, the Creditors have not objected to the proposed grant of a mortgage to secure fees of up to $100,000.00 that may be awarded to counsel and other professionals as a conflict of interest. The Debtor contends that because he does not have sufficient liquid assets (i.e. cash) to pay a retainer that would be security for any awarded fees, he is seeking to grant a mortgage in lieu of a cash retainer. In Martin, the mortgage was on investment property that the debtors did not intend to liquidate, not on property used as the debtors' personal residence or in operating their business. Id. at 176. The debtors in Martin also had substantial equity in the property subject to the mortgage. Id. Here, the proposed mortgage will not include the Debtor's residence, but will include the Sunapee Land which the Debtor has used, or intends to use, in his

proposed real estate development and bulk water businesses.

The record in this matter reveals a substantial disagreement between the Debtor and the Creditors over the value of the property proposed for inclusion in the mortgage to benefit counsel and other professionals. However, all parties agree that the value of the properties in question is dependent in large part on future development. Accordingly, the beneficiaries of the proposed mortgage will have an interest in the successful confirmation of a plan of reorganization, or a sale, that will enable such values to be realized. That interest does not create any meaningful incentive for the beneficiaries of the mortgage to act contrary to the best interests of the estate. Id. at 180. That the Debtor's counsel and other professionals may appear to have a strong interest in successfully resolving this chapter 11 proceeding does not create an appearance of a conflict of interest. The Debtor's counsel or other professionals would always have a strong interest in confirming a plan, and their interest would exist regardless of whether they held a cash retainer, no retainer, or a mortgage. Accordingly, the Court finds that the mortgage proposed in the Motion does not create an actual conflict of interest or the appearance of a conflict of interest sufficient to justify denying the Motion under the standards in Martin.

**B. Proposed Mortgage As A Priming Lien**

The Motion seeks Court approval for the Debtor to incur secured debt in the form of a Mortgage in the amount of $100,000.00 to secure fees to be awarded to counsel and other professionals retained by the Debtor. The Motion also proposes that the mortgage would be a priming lien against the Creditors' prepetition secured claims against three parcels of property and a junior secured claim on other parcels of real estate. Section 364(d) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the

>> obtaining of credit or the incurring of debt secured by a senior or
>> equal lien on property of the estate that is subject to a lien only if–
>>> (A) the trustee is unable to obtain such credit otherwise; and
>>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

### 1. The Valuation Evidence

The Debtor submitted two affidavits in support of his valuation of the parcels to be subject to the mortgage contemplated in the Motion. The first affidavit is from Darryl Salls (Doc. No. 87) (the "Salls Affidavit"). The second affidavit is from the Debtor himself (Doc. No. 88) (the "Jennings Affidavit").

The Salls Affidavit values the First and Second Sunapee Parcels, Blueberry Farm and the Butternut Cottage properties at $7,239,736.00. The value is based upon comparative market analysis conducted by or for Mr. Salls, a real estate broker. The Salls Affidavit is not a formal appraisal and would not be admissible as an expert report or opinion. However, Mr. Salls has been involved in real estate sales in the Dartmouth/Lake Sunapee area since 2000. He valued the Sunapee Land at $6,832,236.00 based upon other properties listed and or sold near the Sunapee Land in late 2008 through November 9, 2009. His analysis was based in part on fourteen properties listed for sale ranging between one and eighty-six acres with an average size of five acres. His analysis was also based in part on five actual transactions, four of which ranged between two and eight acres and one of 100 acres. His comparative market analysis contains no explanation or adjustments when comparing the sale of parcels of five or less acres to the value of an undeveloped 320-acre parcel. He states in his affidavit that "the property may be viewed

as having in addition, provable water resources, town support for a sewer line going across the property, and an approved subdivision plan." Salls Affidavit, at 3. However, he offers no insight into the basis for such assumptions, the economic impact of those assumptions, or how the assumptions affect value in relation to comparable properties. He did not ascribe any value to water rights or the development of water rights. He offered no comment or analysis regarding the significant investment needed to obtain subdivision approval, complete infrastructure, and bring the property to the point where building lots could be sold. He offered no analysis of whether any discount should be applied to his valuation of the Sunapee Land if it was sold to a third party for development.

The Jennings Affidavit is based on the Debtor's long-time residence in New Hampshire in general and Sunapee in particular. He values the Sunapee Land at "no less than" $6,500,000.00. His valuation is based in part on the analysis in the Salls Affidavit, the money invested in developing the water resource, and various offers and expressions of interest in the land between May 4, 2006 and May 1, 2009. The Debtor's reliance on the Salls Affidavit does not add or subtract from its evidentiary value or the evidentiary value of his own affidavit. Although the Jennings Affidavit states that "no less than $1,500,000.00" has been expended to develop the property as a bulk water resource, it also states that "I have not attempted to value the water rights in this Declaration, but note here that offers on the property have contemplated [water rights] as a separate item to be purchased or negotiated in a joint venture." Jennings Affidavit ¶ 10. Accordingly, the Jennings Affidavit offers no basis for including the value of any water rights for the Sunapee Land. After reviewing the various letters of intent, offers, and other expressions of interest attached to the Jennings Affidavit, the Court finds a number of common elements or terms: (1) the proposals are subject to receiving government approvals, which the

9

Salls Affidavit assumed were in place; (2) joint development or profit participation between the Debtor and proposed buyer post-closing; (3) deferred payment of a large percentage of the purchase price until actual sales occur with either actual or de facto subordination of the payment to construction loans or development costs; and (4) the failure of the Debtor, or the proposed buyer, to pursue the proposed transaction due to better conflicting offers or a lack of financing. On balance, the evidence of previous interest in the parcels provides little support for the values in the Jennings Affidavit.

The Creditors submitted an appraisal report prepared by Jonathan H. Frank of F & M Appraisal, LLC in Milford, New Hampshire dated December 30, 2009 (Doc. No. 92) (the "Frank Appraisal"). The Frank Appraisal valued the Sunapee Land at $1,050,000.00 as of December 7, 2009. The Frank Appraisal would qualify as an expert report and is admissible as an expert opinion on value. The Frank Appraisal identifies a number of issues that would impact the market for and value of the Sunapee Land: (1) the existence of steep slopes and ledge on the property and requirements for well water and septic systems that would limit the number of lots to between 30 and 50; (2) approximately 9,200 lineal feet of road would be necessary to achieve the maximum number of lots; (3) the time necessary to obtain subdivision and land use approval and a large parcel would likely take several years; and (4) declining prices and increasing inventory of existing homes in the area of the Sunapee Land would make residential development problematic in the immediate future.

The Debtor's valuation evidence does not address the current difficulties in the real estate development market caused by declining values, the lack of capital for development projects, and the likely time frames for realizing the Sunapee Land's appraised value. The Blueberry Farm and Butternut Cottage properties are somewhat easier to value because they can be sold

without subdivision approval to a buyer who will use the parcels as they currently exist or with renovations financed by an owner.  The Debtor's valuation evidence contains no evaluation of the costs or time frames for developing the Sunapee Land for residential purposes.  Accordingly, the Court finds that the Debtor's valuation evidence is entitled to substantially less weight than the Creditors' evidence.

The Court finds that the Creditors' evidence addresses the costs and lead times involved in developing the Sunapee Land.  However, even the Frank Appraisal is based upon assumptions about developing the Sunapee Land that would require significant capital resources and many years to obtain necessary governmental approvals.  To realize the Sunapee Land's appraised value, any buyer or owner would have to commit to significant lead time for governmental approvals for development, fund the significant capital costs necessary to permit the actual sale of building lots, and tolerate the current market risks associated with low demand, high unsold inventory, and the long time it would take to sell individual lots.  Accordingly, the Court finds his valuation to be speculative in this context because it is realizable only at significant risk to a buyer or an owner.

### 2. Adequate Protection For Priming Lien

The Motion may be granted only if the Court finds that the Creditors are adequately protected.  11 U.S.C. § 364(d)(1)(B).  The Debtor has the burden of proof on the issue of adequate protection.  11 U.S.C. § 364(d)(2).  The term "adequate protection" is not defined in the Bankruptcy Code.  Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994); In re First South Sav. Ass'n, 820 F.2d 700, 710 (5th Cir. 1987).  But adequate protection may be provided by periodic cash payments, additional or replacement liens, or such other relief that gives result in "indubitable equivalent"

of the secured creditor's interest in such property. See 11 U.S.C. § 361; Swedeland, 16 F.3d at 564. The proposed adequate protection should provide the prepetition secured creditor with the same level of protection it would have had if the proposed superpriority mortgage had not been approved. Id. Because the existing secured creditors relied on their liens when extending credit, a court that is asked to grant a superpriority lien must be "particularly cautious" in approving such a lien. First South Sav., 820 F.2d at 710.

The Motion proposes to provide adequate protection to the Creditors through an equity cushion in the Sunapee Land and the Blueberry Farm, plus an additional junior lien on the Butternut Cottage property. The Court finds that the Debtor has failed to establish that his proposed adequate protection will provide the Creditors with the "indubitable equivalent" of their prepetition interest in the Sunapee Land and the Blueberry Farm parcel. The evidentiary record submitted by the parties reveals that any equity cushion in the Sunapee Land currently enjoyed by the Creditors is speculative and is based upon assumptions regarding capital investment and the real estate market for primary residences and second homes. The additional lien proposed for the Creditors in the Blueberry Farm and Butternut Cottage properties is supported by an equity cushion of $289,610.00[6] without considering the proposed priming lien and the existing Bluestone lien. The Creditors' aggregate secured interest in the Sunapee Land is $779,423.00. Accordingly, the additional collateral amounts to no more than 37 percent of their aggregate interest.

However, the additional collateral subjects the Creditors to several risks which diminish its real value as adequate protection. First, the proposed priming lien on the Blueberry Farm

---

[6] $300,000.00 (Butternut Cottage value) + $109,000.00 (Blueberry Farm value) - $119,390.00 (existing lien on Butternut Cottage) = $289.610.00

parcel effectively eliminates any equity for the Creditors, including the existing Bluestone lien. Second, the priming lien is a junior lien on the Butternut Cottage property, which subjects the Creditors to the risk that the senior mortgage holder could force them to bid at a foreclosure sale to protect their interest and the risk that the sale price at any foreclosure would likely be depressed due to the existing senior mortgage, which would survive any foreclosure. Third, the Creditors would share the two additional liens, presumptively pro rata. Fourth, to the extent that the Sunapee Land includes unencumbered parcels in addition to the First Sunapee Parcels and the Second Sunapee Parcels, the Creditors would share additional liens on such parcels, presumptively pro rata. The need to coordinate any action to protect the second position on the Butternut Cottage and any unencumbered parcels in the Sunapee Land, or realize the value of the additional mortgages on such parcels, diminishes the independence of their liens and their respective freedom of action. The Creditors would be forced to undertake collective action to commence and conduct a foreclosure sale, bid at a sale by a senior mortgage or tax lien in order to protect their joint interest, or to pay real estate taxes to prevent the accrual of interest ahead of the additional mortgages. The Creditors' existing liens were incurred separately with separate collateral, and the Debtor has failed to present evidence on how the provision of a consolidated additional lien constitutes the "indubitable equivalent" of the Creditors' respective prepetition interests. Accordingly, the Court finds the economic value of the proposed additional liens to the Creditors to be speculative and insufficient.

## IV. CONCLUSION

The Court will issue a separate order denying the Motion to Strike and denying the Motion without prejudice to the Debtor proposing alternative security for professionals which

satisfies the requirements of the Bankruptcy Code.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   February 25, 2010                              /s/ J. Michael Deasy
                                                                              J. Michael Deasy
                                                                              Bankruptcy Judge